**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,**

v.

**CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants.**

**No. EC 72–11–K.**

United States District Court,
N. D. Mississippi, E. D.

Aug. 4, 1972.

---

D. C., Alfred P. Holmes, Jr., Corps of Engineers, Mobile, Ala., for defendants.

Hunter M. Gholson, Columbus, Miss., John H. Gullett, Washington, D. C., for defendant-intervenor, Tennessee-Tombigee Waterway Authority.

Fred M. Bush, Jr., Tupelo, Miss., for defendant-intervenor, Tombigee River Valley Water Management District.

## MEMORANDUM OPINION

KEADY, District Judge.

On May 25, 1971, the President of the United States presided over the dedication and ground breaking ceremony at Mobile, Alabama, of the Tennessee-Tombigbee Waterway, a navigation project in Alabama and Mississippi which Congress authorized in 1946.[1] By this project the Army Corps of Engineers was authorized to construct a waterway connecting the north-flowing Tennessee River with the south-flowing Tombigbee River so as to provide a continuous waterway from the Tennessee, upper Mississippi and Ohio Valleys to the tidewater port of Mobile, on the Gulf of Mexico. The waterway, when completed, is expected to become a new, inter-regional trade route between the Gulf Coast and much of the mid-continent region of the United States. The initial phase of the work, scheduled to commence in October 1971, involves the construction of a lock and approach canal at Gainesville, Alabama.

### I.

Richard S. Arnold, Texarkana, Ark., Jon T. Brown, Washington, D. C., Roderick Cameron, East Setauket, N. Y., for plaintiffs.

Irwin Goldbloom and A. T. Giattina, Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Richard P. Appleton, Corps of Engineers, Washington,

(a) *Nature of the Project.*

The waterway, as set forth in the general design document, extends from Demopolis, Alabama, on the existing canalized Black Warrior-Tombigbee Waterway, 217 miles from Mobile, upstream via the Tombigbee River, East Fork of the Tombigbee, Mackeys Creek, a deep

---

1. Known officially as "Tennessee-Tombigbee Waterway—Alabama and Mississippi—Navigation", the project was authorized by Rivers and Harbors Public Works Act approved July 24, 1946, 60 Stat. 634, Pub.L. 79–525, in accordance with recommendations contained in House Document 486, 79th Congress, 2nd Session. The general plan of improvement was revised by General Design Memorandum approved by the Office, Chief of Engineers, April 12, 1962.

cut through the divide into Yellow Creek, thence via Yellow Creek to mile 215 on the sailing line of the Tennessee River in Pickwick Pool near the common boundary of Alabama, Tennessee, and Mississippi. The overall project length, Demopolis to the Tennessee River, corrected for proposed cutoffs, is 253 miles. County route map is appended as Exhibit "A".

The project is divided into three reaches. The river section extends from Demopolis for 168 miles to a point just south of Amory, Mississippi. The plan for that reach includes channel improvement and a series of four conventional locks and dams. For the next 45 miles, the waterway will consist of a canal parallel to the river and separated therefrom by levees. The difference in elevation in that reach will be overcome by five canal locks. The canal terminates at Bay Springs lock and dam in Mackeys Creek, where the waterway will be lifted 84 feet to the pool elevation of the Pickwick reservoir on the Tennessee River. From the pool of the Bay Springs lock and dam a deep cut will be made through the ridge to the Pickwick pool on the Tennessee River, via its tributary, Yellow Creek. Length of the divide section is 40 miles, including the 27-mile-long cut through the ridge. Overall difference in elevation between Demopolis and Pickwick pools is 341 feet, to be overcome by the 10 locks, referenced above.

The plan provides for lock chamber dimensions of 110 by 600 feet. Authorized depths are 9 feet in the river section and 12 feet in the canal and divide sections. Authorized bottom width is 300 feet except in the actual divide cut, where the authorized width is 280 feet.

The waterway project will require the commitment of approximately 70,000 acres of land which presently are in forest or are used for agricultural pursuits. Of this amount about 24,000 acres would be fully committed, with the remainder committed in varying degrees. The land, which is presently planned to be procured by permanent easement, will not be completely removed from the agricultural and forest base. The bottom land hardwood and other forest areas which are cleared or inundated will be lost for future timber production. About 40,000 acres of artificially impounded water surface will be created as a result of the project, and within the confines of the newly established lakes about 170 miles of tributary streams and 140 miles of the main stem of the Tombigbee River will lose their identity as free-flowing streams. However, the dams on the waterway will be "run-of-the-river" dams built for low retention and subject to complete inundation in flood seasons. Admittedly, the project will have significant effects, some adverse and others beneficial, upon the quality of the environment in its present setting.

(b) *Nature of Litigation and Prior Proceedings.*

The present litigation began on July 14, 1971, upon the filing of a class action in Federal District Court for the District of Columbia against the Corps of Engineers, the Secretary of the Army and Chief of Engineers to restrain them from initiating or continuing with the construction of the project. The named plaintiffs were two organizations, Environmental Defense Fund, Inc. (EDF), a non-profit New York corporation whose membership consists of scientists, environmentalists and other interested citizens throughout the United States, some residing in the project area of Alabama and Mississippi, and the Committee for Leaving the Environment of America Natural (CLEAN), a non-profit unincorporated association located at Starkville, Mississippi, whose membership is composed of Mississippi and Alabama residents who enjoy and are interested in preserving the natural environment of the Tombigbee region, and a single individual, James D. Williams, an assistant professor of biology at Mississippi State College for Women and a resident of Columbus, Mississippi. The complaint set forth seven independent causes of action charging that the defendants had violated various federal

statutes as well as the Constitution by proceeding with the project.[2]

On September 15 and 16, an evidentiary hearing on plaintiffs' motion was held in Washington, D. C., before United States District Judge John Lewis Smith, Jr. Judge Smith concluded from the evidence that plaintiffs made a "substantial showing of a likelihood" that the defendants, in the project's planning, design and development and in making the decision to construct the waterway, had not fully complied with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., and the Fish and Wildlife Coordination Act of 1934 as amended, 16 U.S.C. § 661, et seq. Finding that plaintiffs would suffer irreparable injury, the court on September 21 issued the preliminary injunction requested.

After the federal defendants answered the complaint, Tennessee Tombigbee Waterway Development Authority, a multi-state corporate body chartered by Congress to promote the waterway, with headquarters at Columbus, Mississippi, and Tombigbee River Valley Water Management District, a corporate body organized under Mississippi law and composed of twelve counties in northeast Mississippi interested in developing the project, with leave of the court, were admitted as defendant-intervenors.[3]

Upon the joint application of defendants and defendant-intervenors, Judge Smith, on January 31, 1972, transferred the case to this court under 28 U.S.C. § 1404a, by finding the transfer to be for the convenience of the parties and witnesses and in the interest of justice.

Following pretrial conference and the issuing of a ruling on certain discovery matters in controversy, the court on April 13, held a preliminary hearing on defendants' motion to dismiss certain portions of the complaint or in the alternative for partial summary judgment in their favor. After full arguments, the court dismissed as legally insufficient all of plaintiffs' asserted causes of action other than the first cause of action based on NEPA and scheduled an evidentiary hearing to determine whether the provisions of that statute had been complied with.[4]

2. This suit arises under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, et seq., and other federal enactments (Fn. 4). Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1331, and venue is properly laid under `28 U.S.C. § 1391(e).

3. The original defendant-intervenors were subsequently joined by additional intervening parties consisting of numerous counties, municipalities, chambers of commerce, development organizations, sportsmen and conservation associations located within the Alabama-Mississippi area affected by the project. All interventions were allowed without objection from plaintiffs.

4. In a bench ruling the court dismissed plaintiffs' second cause of action based upon the Fish and Wildlife Coordination Act of 1934; the third cause of action based upon the River and Harbors Improvements Act, 33 U.S.C. § 540; the fourth cause of action based upon the cost-benefit statute, 33 U.S.C. § 701a; the fifth cause of action based upon the National Historic Sites Act of 1935, 16 U.S.C. § 461 et seq.; as well as the sixth cause of action based upon the Fifth and Ninth Amendments to the United States Constitution as encompassing the "right to enjoy the beauty of God's creation and to live in an environment that preserves the unquantified amenities of life." Plaintiffs voluntarily withdrew the seventh cause of action based upon an alleged violation of the public trust doctrine but maintained that they were entitled to summary judgment in their favor on the second and fifth causes of action. It was the court's view that all of the mentioned statutes, enacted long before NEPA, did not provide judicial remedies for private citizens or private interests against governmental actions; that the statutes were passed by the Congress either to give direction to responsible federal officials to consult and confer with other specified governmental agencies before carrying out a particular project or to furnish the Congress data for its own legislative purposes; that none of the cited statutes articulated a standard of agency action sufficiently explicit to be reviewable by the courts; and hence plaintiffs did not present justiciable controversies by invoking their provisions. The court further held that the federal policies affecting fish and wildlife, his-

Beginning June 19, the court conducted a 7-day evidentiary hearing at Aberdeen, Mississippi, and received extensive proof from all parties. The case is now ripe for decision, after oral argument and briefs of counsel, and this Memorandum Opinion shall suffice for findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## II.

Several distinct issues are presented in this environmental litigation. Broadly stated, plaintiffs contend that they should prevail for either of two reasons, viz.: (1) the actions of the defendants in recommending the Tennessee-Tombigbee Waterway, and the decision to proceed with its construction, violate the substantive environmental policies of the nation as declared in § 101 of the Act; and (2) the defendants, in their study and planning of the project and reporting and recommending it to the ultimate decision-makers—in this case the Congress and the President—failed to adhere to the procedures required by § 102. For reasons that follow, the court holds that the plaintiffs, although possessing requisite standing to sue, fail on both issues and are not entitled to any relief on their complaint.

(a) *Plaintiffs' standing to sue.*

The evidence adduced establishes that Dr. Williams, the individual plaintiff, has used the Tombigbee River for both recreational and scientific purposes, enjoying the natural state of the region in proximity to his place of residence; that CLEAN's membership consists of 60 to 70 persons residing near the project area who fish, hunt and engage in other recreational pursuits made possible by the Tombigbee; and that EDF's membership includes environmentalists, like Dr. Williams, who live close to the project area and make scientific and recreational use of the river. The common complaint is that their usage and enjoyment of the present environment will be adversely affected by the waterway's construction. Given these facts, the standing of all named plaintiffs to maintain this suit under NEPA was clearly established by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, decided April 19, 1972. As organizations having members who assert direct injury, EDF and CLEAN may represent those members in this proceeding. It is likely that EDF, when suit was filed July 14, 1971, had only one member who could claim a personal adverse effect from the project. Other persons suffering direct injury joined the organization after the *Sierra Club* case was decided and before trial of this cause. The objection to the standing of this particular organization is not well taken. Moreover, the action is properly maintainable under Rule 23 as a class action on behalf of all persons aggrieved or detrimentally affected by the project, and has been heretofore so allowed by this court.

(b) *Substantive questions.*

By § 101 [5] the Congress declared the Nation's environmental policy in broad

---

toric sites, and environment-related factors remained a proper subject of inquiry in determining whether the Corps of Engineers had complied with NEPA. EDF v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1971).

5. National Environmental Policy Act, § 101, 42 U.S.C. § 4331 (1969) provides:

"(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under

and general terms and provided that it was the continuing responsibility of the federal government to improve and coordinate all federal undertakings to achieve six stated environmental goals. Plaintiffs urge first that the waterway project is not economically justified since the benefits are exceeded by the costs; and next that it should not be environmentally approved because the injury to the quality of man's environment outweighs any gain likely to accrue. Finally, they assert that the stated goals of § 101 create new substantive rights which are infringed by the proposed action and must be vindicated in this proceeding.

The economics of the waterway proposal, after initially receiving an adverse report in 1951,[6] were periodically restudied by the Chief of Engineers pursuant to the direction of Congress. The study was carried out by the Mobile District, Corps of Engineers, in accordance with criteria prescribed by law [7] and regulations.[8]

The first restudy, completed June 30, 1960, was favorably reported to Congress April 9, 1962, and showed a benefit-to-cost ratio of 1.08 to 1 calculated on the basis of a $2\frac{5}{8}\%$ interest rate.[9] A second restudy completed 6 years later, June 30, 1966, resulted in an estimated benefit-to-cost ratio of 1.24 to 1 for the

---

which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."

6. By an investigative staff appointed by the House Appropriations Committee.

7. 33 U.S.C. § 701 et seq., provide for the Chief of Engineers on any work of improvement for navigation to investigate the proposal and submit plans to the Congress (701–1(a)) through the Secretary of the Army; that improvements on navigable waters should be undertaken "if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected," (701a); and that the federal investigations of improvements of rivers and other waterways "shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and supervision of the Chief of Engineers" (701b); and no project shall be authorized by the Congress unless a report thereon has been previously submitted by the Chief of Engineers (701b–8). The applicable sections originated as Act of March 2, 1945, 59 Stat. 10.

8. The interest rate is an important factor for discounting future benefits and computing costs and is controlled by regulations adopted by the Secretary of the Interior pursuant to the Water Resources Research Act of 1964, 78 Stat. 329. Under the terms of the current regulation, 18 CFR 704.39, the interest rate applicable to the waterway project, because of the date of authorization, is set at $3\frac{1}{4}\%$.

9. After this submission, increase in rates of interest required the application of a revised rate of $3\frac{1}{8}\%$, and this action reduced the economic ratio to 1.01 to 1.

entire project, and Congress was so advised March 30, 1967.[10] The Corps' most recent economic analysis (July 1970), which was based on a 50-year life at 3¼% interest, determined the estimated annual benefits as follows:

| | |
|---|---|
| Navigation | $27,675,000 |
| Recreation | 3,298,000 |
| Fish and Wildlife | 182,000 |
| Area Redevelopment | 2,595,000 |
| Total | $33,750,000 |

The estimated annual charges for the project were determined to be $21,522,-000. Thus, as presently calculated, the benefit-to-cost ratio of the project is fixed at 1.6 to 1. Plaintiffs vigorously contest the correctness of this computation of the benefit-to-cost ratio by urging, inter alia, that the navigation benefits were substantially overstated by the Corps, the interest rate of 3¼% provided by current regulations and which the Corps used to discount benefits and costs was unrealistic, and should be not less than 5⅜% as of July 1970, and that when other appropriate adjustments such as environmental costs and secondary costs are taken into account, the discount rate should be significantly increased, thus producing an excess of costs over benefits.

The currently estimated federal costs for completion of the waterway, which is expected to take a minimum of nine years, is $346,170,000. The total estimated non-federal cost for the waterway development furnished by the local interests is $40,400,000. Congress appropriated construction funds of $1 million for

the fiscal year 1971 and $6 million for the fiscal year 1972.[11]

■ As for the challenge to the Corps' method of calculating benefits and costs, it seems indisputably clear that Congress has committed economic and technical matters regarding the improvements of rivers and harbors to the determination of the Department of the Army, under the direction of the Secretary of the Army and supervision of the Chief of Engineers (Fn. 7). The monetary and engineering feasibility of a project concerning navigable waters, over which Congress has undisputed jurisdiction, as in this case, does not raise a judicial question. In upholding the constitutionality of a statute authorizing the construction of the Denison Reservoir on Red River in Texas and Oklahoma, the Supreme Court held: "It is for Congress alone to decide whether a particular project, by itself or as part of a more comprehensive scheme, will have such a beneficial effect on the arteries of interstate commerce as to warrant it. That determination is legislative in character." Oklahoma ex rel. Phillips v. Guy Atkinson Co., 313 U.S. 508, 527, 61 S.Ct. 1050, 1060, 85 L.Ed. 1487, 1501 (1940); United States v. W. Va. Power Co., 122 F.2d 733, 738 (4 Cir. 1941). Other courts, in construing NEPA's provisions, have felt bound by benefit-to-cost ratios adopted by the Corps of Engineers in similar projects.

Indeed, it is apparent that methods for computing benefits and costs in waterway projects may involve myriad factual elements of great diversity, aptly

10. In his transmittal letter to the Chairmen of the Public Works Committees of the House and Senate, Stanley R. Resor, Secretary of the Army, expressed the opinion that the proposed investment (then estimated at $316 million) was "only marginally justified", also stating:

"Furthermore, if the costs of the project prove to be even slightly underestimated, or the projected waterway traffic slightly overestimated, the present barely favorable benefit-cost ratio will be lost.

All in all, the conclusion is inescapable that the Tennessee-Tombigbee navigation project continues to lack that margin of economic safety which typically marks federal investments in water resource development.

The Bureau of the Budget, in advising that there is no objection to the submission of this report to the Congress, states that it agrees with the conclusion that the project is only marginally justified." See Supplement to General Design Memorandum.

11. The President's budget for the fiscal year 1973 includes a $12 million appropriation for the project.

described in a leading case as "innumerable and in many cases esoteric".[12] Therefore, any question as to the adequacy or accuracy of defendant's economic and technical analysis must be addressed to the Congress. As of this time, the Congress, although fully apprised of the economic strengths and weaknesses inherent in the Tennessee-Tombigbee proposal, has nevertheless exercised its prerogative to fund commencement of the project.

▮ Neither do we conceive it to be the judicial role to decide whether the Tennessee-Tombigbee project represents an environmental disaster and should be halted by the courts, as contended by plaintiffs, or that its completion will mean the fulfillment of social, recreational and commercial opportunities for people residing in an economically depressed and socially deprived area, as urged by defendants.

▮▮ Courts do not sit to decide the substantive merits or demerits of a federal undertaking under NEPA, but only to make certain that the responsible federal agency, in this case the Corps of Engineers, makes full disclosure of environmental consequences to the decisionmakers. While the exact scope of § 101 has not been defined by the Supreme Court, the prevailing view of the federal courts is that neither this section nor other provisions of NEPA create substantive rights that are enforceable in the courts. EDF v. Corps of Engineers, supra, 325 F.Supp. at 755; Conservation Council of North Carolina v. Froehlke, supra; EDF v. Hardin, 325 F.Supp.

1401 (D.D.C.1971); Committee for Nuclear Responsibility v. Seaborg, 298 F.2d 783 (D.C.C.1971); Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109 (D.C.Cir. 1971). The reasoning of the decided cases is that § 101 vests in federal agencies broad discretion "to use all practicable means" consistent with other national policy to enhance the quality of man's environment, and leaves with the decisionmakers, and not the courts, the question of whether a given project shall proceed. In the *Calvert Cliffs'* case, the court observed that the flexible substantive policy of NEPA (as set forth in § 101) "leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." p. 1112. We, therefore, hold that § 101 does not authorize this court to substitute its opinion for that of the decisionmakers as to the wisdom or desirability of the Tennessee-Tombigbee project.

### (c) *Procedural issues.*

The dominant issue emerging in this case is to ascertain and apply the exact requirements of § 102 of NEPA. While § 101 establishes a broad national policy recognizing the importance of environmental quality and charges the federal government with management of that policy, it is clear that § 102, known as the "action-forcing" section of NEPA,[13] specifically provides procedures to insure that the national environmental policy of § 101 and the goals pursuant thereto will be implemented by federal agencies.[14]

---

12. Quoting Judge Eisele in EDF v. Corps of Engineers, 325 F.Supp. at 740; Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222 (M.D.N.C. 1972).

13. See Calvert Cliffs' Coordinating Com. v. United States Atomic Energy Com., supra, at 1113.

14. § 102 of NEPA, 42 U.S.C. § 4332, provides:
 "The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws

of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisiomaking which may have a impact on man's environment;
 (B) identify and develop methods and procedures, in consultation with the

A principal objective of NEPA was to remedy shortcomings in the legislative foundation of existing programs, which arose from a concern that there was in some areas of federal activity inadequate experience or precedent to assure "substantial and consistent consideration of environmental factors in decisionmaking," and in other programs an absence of clear authority "to assure consideration of environmental factors which conflict with other Federal objectives." [15]

Section 102 mandates that "to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall" implement the national environmental policies and goals by compliance with certain enumerated procedural requirements.

Plaintiffs assert that the Corps of Engineers, as the responsible federal agency, violated § 102(1) and the four specific procedural requirements of subparagraphs (A), (B), (C), and (D) under § 102(2).

Subparagraph (A) requires utilization of a "systematic, interdisciplinary approach" to insure the integration of the natural and social sciences and the environmental design arts into an agency's planning and decisionmaking process.

Subparagraph (B) requires that federal agencies, in consultation with the Council on Environmental Quality (CEQ), develop methods and procedures designed to give "previously unquantified environmental amenities" appropri-

---

Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5 (United States Code), and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter."

15. 115 Cong.Rec. (Part 30) 40419 (1969), section-by-section analysis of S. 1075 as reported to the Senate.

ate weight in decisionmaking along with technical and economic considerations.

Subparagraph (C) requires that every agency proposal for legislation or other major federal action which may significantly affect the "quality of human environment" be accompanied by a "detailed statement" of the environmental impact of the proposed action, unavoidable adverse effects, and alternative action. Plaintiffs have directed the thrust of their proof to alleged inadequacy of a § 102 Environmental Impact Statement (EIS) submitted by the Corps of Engineers.

Subparagraph (D) requires that agencies "study, develop and describe all appropriate alternatives" to proposed actions which involve "unresolved conflicts concerning alternative uses of available resources."

■ At the outset plaintiffs urge, and we think correctly, that the phrase "to the fullest extent possible" is one of emphasis and not limitation, thus the procedural duties of § 102(2) require maximal compliance. The legislative history of NEPA clearly indicates that the phrase "to the fullest extent possible" was inserted by Senate and House conferees to insure that federal agencies fully comply with the directives set out in subparagraphs (A) through (H) "unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible."[16] Nevertheless, in reviewing the sufficiency of an agency's compliance with § 102, we do not fathom the phrase "to the fullest extent possible" to be an absolute term requiring perfection. If perfection were the standard, compliance would necessitate the accumulation of the sum total of scientific knowledge of the environmental elements affected by a proposal. It is unreasonable to impute to the Congress such an edict. We preface our consideration of plaintiffs' contentions by declaring that the phrase "to the fullest extent possible" clearly imposes a standard of environmental management requiring nothing less than comprehensive and objective treatment by the responsible agency. Adherence to this standard will make environmental policies "a real working part of all the activities of all Federal agencies and programs," as visualized by its leading Senate sponsor.[17] Thus, an agency's consideration of environmental matters that is merely partial or performed in a superficial manner does not satisfy the requisite standard.

Agency compliance with the specific duties imposed by § 102(2) and its subparagraphs assures effective administration of the nation's environmental policies, regulations, and laws as directed by § 102(1). Therefore, we go directly to the issues of § 102(2) noncompliance raised by the plaintiffs, and evaluate the evidence in accordance with NEPA's standards for a reasoned environmental management. While some courts have viewed the sufficiency of an EIS required by § 102(2)(C) as determinative of an agency's compliance with the duties imposed by § 102(2)(A) and (B), we shall consider together the duties contemplated by the latter two subparagraphs before examining the EIS filed by the Corps of Engineers.

*Section 102(2)(A) and (B).*

The systematic interdisciplinary approach of § 102(2)(A) is designed to assure better programs and a better environment by bringing together the skills of the biologist, the geologist, the

---

16. Conference Report, 115 Cong.Rec. (Part 29) 39703 (1969).

17. Senator Jackson, in a speech on the floor of the Senate, 115 Cong.Rec. (Part 21) 29087 (1969). He also stated:
"There are about 80 major Federal agencies with programs underway which affect the quality of the human environment. If an environmental policy is to become more than rhetoric, and if the studies and advice of any high-level, advisory group are to be translated into action, each of these agencies must be enabled and directed to participate in active and objective-oriented environmental management. Concern for environmental quality must be made part of every phase of Federal action."

ecologist, the engineer, and landscape architect, the economist, the sociologist, and the other disciplines relevant to the project. The mandated approach makes planning no longer the sole concern of the engineer and the cost analyst, and assures consideration of the relationships between man and his surroundings.

■ The purpose of § 102(2)(B) is to lend methodology to the broad interdisciplinary approach. It requires that agencies develop purposeful methods and procedures to evaluate objectively the full environmental impact of a proposed project and weigh the ecological desirability of the project along with its economic and technical feasibility in planning and decisionmaking. This technique insures that the *full cost* of the federal action will be known.[18] For example, a particular project may be technically feasible and economically beneficial as reflected by the computed benefits-to-cost ratio; however, if the environmental study reveals that a potential ecological disaster is likely to be caused, a recommendation for abandoning the project or radically revising it to avoid environmental harm will, no doubt, result. § 102(2)(B) was intended to insure that considerations of this type are made in the early planning stage of a project.

■ It is to be observed that § 102 (2)(B) does not prescribe an exact formulation of the methods and procedures to assure recognition of environmental amenities but leaves their development to the responsible agency in consultation with CEQ. While CEQ's

interim guidelines were not definitive in this area, methods and procedures, to be appropriate, certainly do not necessitate the use of computer analysis, as the plaintiffs contend, but are sufficient if they effectively measure life's amenities in terms of the present state of the art. Although computers may some day be used to quantify ecological elements more precisely, we conclude that at this point in time a valid ecosystems analysis may be achieved by an interdisciplinary team of scientists conducting a rigorous examination of the areas affected by the project.

The uncontradicted evidence shows that following NEPA's passage, the Mobile Office of the Corps, on March 6, 1970, created the Environmental and Resources Branch, which was responsible for the examination of the environmental impacts of its projects. The Corps recognized NEPA's applicability to the Tennessee-Tombigbee proposal and assigned to John Rushing, Chief of the Environmental Studies Section, the task of organizing a team of scientists to make the environmental study. Rushing, a graduate civil engineer with a master's degree in water resources management, had 10 years experience in water resources planning on Corps projects. Water resources planning is a field that relates not merely to the engineering disciplines but to biology, archeology, recreational planning and landscape architecture. Rushing headed a six-man team of Corps personnel having expertise in water resources planning, sanitary and civil engineering and various phases of

18. This is supported by the legislative history of § 102(2) (B).

"All agencies which undertake activities relating to environmental values, amenities, and aesthetic considerations, are authorized and directed, after consultation with the Council and other environmental control agencies, to make efforts to develop methods and procedures to incorporate those values in official planning and decisionmaking. In the past, environmental factors have frequently been ignored and omitted from consideration in the early stages of planning because of the difficulty of evaluating them in comparison with economic and technical factors. As a result, unless the results of planning are radically revised at the policy level—and this often means the Congress—environmental enhancement opportunities may be foregone and unnecessary degredation incurred. A vital requisite of environmental management is the development of adequate methodology for evaluating the full environmental impacts and the full costs—social, economic, and environmental—of Federal actions." 115 Cong.Rec. (Part 30) 40420 (1969), section-by-section analysis of S. 1075 as reported to the Senate.

biology and ecology.[19] The evidence establishes that the team, together with other Corps scientists at the Mobile office used in consultation, represented an adequate range of relevant sciences and possessed the capability to make an interdisciplinary approach.

The team was supplied with interim guidelines adopted April 30, 1970, by CEQ, 35 Fed.Reg. 7390, and circulars published by the Chief of Engineers. Although all team members were Corps employees, there is no indication that they approached their assignment with bias for the project, and their sincerity in trying to undertake an objective study is beyond question. The interdisciplinary team maintained offices in the same room and engaged in orderly, continuing dialogue relating to the different areas of expertise that they and other scientists in the Mobile office possessed. The study group made an outline as a team on how to approach the assessment of the total environmental impact, in line with the understanding of the new law and pertinent regulations.

For nearly six months the team pursued a course of study which involved gathering data from the Corps' files and outside sources, and consulting about 60 persons or agencies in the representative fields of mammalogy, herpetology, ornithology, aquatic invertebrates and plankton, entomology and vertebrate ecology, icthyology, water and air quality, and other sciences. At the Corps' request, the Bureau of Sport Fisheries and Wildlife updated its pre-NEPA studies on the fish and wildlife environmental aspects of the project and submitted its report thereon, as required by the Fish and Wildlife Coordination Act of 1934.* The study group consulted with various state agencies, such as the Department of Conservation and Geological Survey of Alabama, Game and Fish Commission, Department of Archives and History and Geological Survey of Mississippi, the Tennessee Valley Authority, and local agencies and public groups. Pertinent research data were obtained from the University of Alabama and Mississippi State University. From the information and research available, the interdisciplinary group determined the various environmental problems presented, and the probable impacts, and from time to time reported its findings to the project engineers for modification in advance design.

During October 1970 the team completed the initial portion of the multi-discipline study and began writing the preliminary draft of a statement identifying what the team regarded as the project's probable significant effects upon the environment. Upon its completion in December, the preliminary draft went through the Corp's internal review process to the Chief of Engineers for comments and evaluation.

In January 1971, the Corps submitted the preliminary draft to three eminent scientists having expertise in ecology, hydrology and environmental design, and obtained their criticisms and contributions for the final impact statement.[20] Also, during January and February the preliminary draft of the impact statement was circulated to 20 federal and state agencies having public responsibility in the areas affected by the project, and

19. Participants, other than Rushing, were Willis E. Rowland, specialist in sanitary engineering, Nathaniel D. McClure, specialist in sanitary and water quality engineering, Donald M. Conlon, civil engineer and biologist, Jack C. Mallory, biologist specialized in the fields of ornithology, mosquito control, and marine life, and Hugh A. McLellan, biologist with training in ecology.

* The argument that this request had to be made at the Cabinet level is without substance.

20. The outside consultants were Dr. Daniel Nelson, limnologist, Oak Ridge Ecology Laboratory; Phillip LaMoreaux, Alabama State geologist and professor of geology, University of Alabama; and Dr. Gerald McLindon, Dean, School of Environmental Design, Louisiana State University.

**930**

their comments were solicited.[21] These agency comments were considered by the interdisciplinary team, and resulted in certain modifications to the views expressed in the preliminary draft. The team spent approximately 32 man-months in studies, culminating in the preparation of a final EIS which, after going through the Corps' internal review process, was filed with CEQ on April 20.

 Although the interdisciplinary team did not collect and analyze samples of flora and fauna or conduct other field explorations as a part of its study, we are persuaded that gathering the extensive data available from the body of scientific knowledge and consulting with governmental agencies having expertise in the different areas, satisfy NEPA's standard of methodology. Certainly, plaintiffs have failed to demonstrate that the available scientific data and literature did not provide adequate bases for an assessment of the environmental impact. In so concluding, we hold that NEPA does not require the Corps to conduct surveys for the location of historical and archeological sites and its duty in that area of investigation is met under the Natural Historic Sites Act[22] by giving appropriate notice to the Secretary of the Interior. This notice procedure effectively alerts the agency having the requisite expertise to make such surveys and avoids needless, duplicative efforts by the Corps.

The evidence discloses that at the beginning of its environmental study the

21. Bureau of Sport Fisheries and Wildlife, USDI; Bureau of Outdoor Recreation, USDI; National Park Service, USDI; U. S. Geological Survey, USDI; Department of Commerce; Department of Housing and Urban Development; Federal Highway Administration, DOT; U. S. Coast Guard, DOT; Federal Aviation Administration, DOT; Federal Railroad Administration, DOT; Tennessee Valley Authority; Appalachian Regional Commission; Department of Agriculture; Bureau of Water Hygiene, EPA; Water Quality Office, EPA; State of Mississippi; State of Alabama; State of Tennessee; Air Pollution Control Office, EPA; and Bureau of Mines, USDI.

22. 16 U.S.C. § 469a provides:

"(a) Before any agency of the United States shall undertake the construction of a dam, or issue a license to any private individual or corporation for the construction of a dam, it shall give written notice to the Secretary of the Interior setting forth the site of the proposed dam and the approximate area to be flooded and otherwise changed if such construction is undertaken: . . .

(b) Upon receipt of any notice, as provided in subsection (a) of this section, the Secretary of the Interior (hereinafter referred to as the 'Secretary'), shall cause a survey to be made of the area proposed to be flooded to ascertain whether such area contains historical and archeological data (including relics and specimens) which should be preserved in the public interest. Any such survey shall be conducted as expeditiously as possible. If, as a result of any such survey, the Secretary shall determine (1) that such data exists in such area, (2) that such data has exceptional historical or archeological significance, and should be collected and preserved in the public interest, and (3) that it is feasible to collect and preserve such data, he shall cause the necessary work to be performed in such area to collect and preserve such data. All such work shall be performed as expeditiously as possible.

(c) The Secretary shall keep the instigating agency notified at all times of the progress of any survey made under sections 469–469c of this title, or of any work undertaken as a result of such survey, in order that there will be as little disruption or delay as possible in the carrying out of the functions of such agency.

(d) A survey similar to that provided for by subsection (b) of this section and the work required to be performed as a result thereof shall so far as practicable also be undertaken in connection with any dam the construction of which has been heretofore authorized by any agency of the United States, or by any private person or corporation holding a license issued by any such agency.

(e) The Secretary shall consult with any interested Federal and State agencies, educational and scientific organizations, and private institutions and qualified individuals, with a view to determining the ownership of and the most appropriate repository for any relics and specimens recovered as a result of any work performed as provided for in this section."

Corps notified the Secretary of the Interior as to the impending construction of the Gainesville lock and dam, and during the summer of 1970, the Department of the Interior caused to be performed a detailed archeological survey of three Alabama counties affected by that initial construction. The Corps did not request, nor has the Secretary of the Interior made, similar surveys of the areas affected by the later construction of the four remaining dams at Aliceville, Columbus, Aberdeen and Bay Springs. The court understands that such requests will be made at different times during the course of construction of the project. Whether this satisfies NEPA's requirements for full disclosure in the EIS will be later discussed in connection with the agency's duties under § 102(2)(C).

Plaintiffs seize upon the fact that since the filing of the EIS the Corps has entered into certain contracts for investigation of ground water, fishes, birds, ecosystems and other aspects of the project area, and argue that these contracts evince inadequacy in the environmental study therefore carried out by the Corps. Plaintiffs fail, however, to support their claim by credible evidence that the data sought by such contracts are essential for an assessment of the significant effects upon the environment. On the other hand, the Corps offers a credible explanation that, having fully identified the significant impacts upon the environment by the interdisciplinary study, the additional data are sought to reduce, if not eliminate, certain potential adverse effects through changes in advance design. Considering the complexity of the proposal from both environmental and engineering standpoints, we accept this as a reasonable procedure for achieving best results in terms of NEPA's overall objectives and goals.

 We, therefore, reject plaintiffs' claims of § 102(2)(A) and (B) violations by defendants.

### Section 102(2)(C).

Plaintiffs have directed the bulk of their proof toward the Corps' alleged noncompliance with § 102(2)(C). That subparagraph requires that every agency proposal for major federal action, which the Tennessee-Tombigbee project undoubtedly is, be accompanied by "a detailed statement", or EIS delineating (i) the environmental impact of the proposal, (ii) its unavoidable adverse effects, (iii) alternatives to the proposal, (iv) the relationship between the local and short-term uses and the long-term productivity of the environment, and (v) irreversible and irretrievable commitment of resources. The obvious purpose of a § 102 statement is to assure that the results of the environmental considerations derived through the interdisciplinary approach and methodology required by § 102(2)(A) and (B) are disclosed in a comprehensive document to be utilized by both the responsible agency and other decisionmakers in the required balancing analysis to which we have previously alluded.[23] As stated in Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827 (D.C.Cir. 1972), the impact statement provides "a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action." As a futher hedge on the objectivity and comprehensiveness of the conclusions reached in an EIS, § 102(2)(C) also requires that the statement be subject to a rigorous review process.[24]

---

23. See Fn. 18 and related text, supra. See also Calvert Cliffs' Coordinating Com. v. United States Atomic Energy Com., supra 449 F.2d at 1114.

24. § 102(2)(C) further provides that: "Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agen-

Finally, the section requires the EIS accompanied by the views and comments of concerned federal, state and local agencies be made available to the President, CEQ and the public.

While the evidence shows without dispute that the EIS was subjected to the required review processes before its release, plaintiffs earnestly contend that the EIS is not "a detailed statement" as required by the Act. Plaintiffs offered a number of witnesses to cite numerous omissions, misstatements, and inadequate statements which they view as significant in that the Corps allegedly reached erroneous conclusions as to the environmental impact of the Tennessee-Tombigbee project and on which the President, the Congress, the public, as well as the Corps itself relied in evaluating the project's desirability.

To judge the merit of plaintiffs' claims, the court must determine what is required to be included in the EIS, a document which Congress unequivocally declares must be "a detailed statement" on five specific points. Necessarily, the EIS must be "marked by abundant detail or thoroughness in treating small items or parts"; the word "detailed" is so defined in Webster's Third New International Dictionary. The legislative history indicates that an EIS, which is required in any major federal action "significantly affecting the quality of the human environment", is to supply "explicit findings concerning the environmental impact which will or may result from the proposed activity." 115 Cong. Rec. (Part 21) 29068 (1969). Specific directions for the content of an environmental statement are provided by CEQ's guidelines as set out in the margin below.[25] These directions emphasize that

cies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes."

25. 35 Fed.Reg. 7390 (April 1970):
"7. Content of environmental statement. (a) The following points are to be covered:
(i) The *probable impact* of the proposed action on the environment, including impact on ecological systems such as wildlife, fish and marine life. Both *primary and secondary significant consequences* for the environment should be included in the analysis. For example, the implications, if any, of the action for population distribution or concentration should be estimated and an assessment made of the effect of any possible change in population patterns upon the resource base, including land use, water, and public services, of the area in question.
(ii) *Any probable adverse* environmental effects which cannot be avoided (such as water or air pollution, damage to life systems, urban congestion, threats to health or other consequences adverse to the environmental goals set out in section 101(b) of Public Law 91–190).
(iii) Alternatives to the proposed action (section 102(2)(D) of the Act requires the responsible agency to 'study,

develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources'). A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects.
(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. This in essence requires the agency to assess the action for cumulative and long-term effects from the perspective that each generation is trustee of the environment for succeeding generations.
(v) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. This requires the agency to identify the extent to which the action curtails the range of beneficial uses of the environment.
(vi) Where appropriate, a discussion of problems and objections raised by other Federal agencies and State and local entities in the review process and the disposition of the issues involved. (This

attention is to be given to "the probable impact of the proposed action on the environment", requiring an analysis of both "primary and secondary significant consequences for the environment", and to "any probable adverse environmental effects which cannot be avoided."

 Thus a § 102 statement must thoroughly discuss the *significant* aspects of the *probable* environmental impact of the proposed agency action. By definition, this excludes the necessity for discussing either insignificant matters, such as those without import, or remote effects, such as mere possibilities unlikely to occur as a result of the proposed activity. This criterion not only adheres to the CEQ guidelines but comports with a rule of reason; it does not, however, encompass the necessity for disclosing "all known possible environmental consequences." [26] Although often desirable, there is no requirement that the statement include maps, backup data or documentation supporting the agency's views. The EIS must be written in language that is understandable to non-technical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise. The statement must include a discussion of problems and objections raised by other federal, state and local agencies in the prescribed review process and the responsible agency's disposition of those issues. The end result of an impact statement is to synthesize the probable significant effects of the project upon the quality of the environment in sufficient detail to enable the agency, the decisionmakers,

and the public to have an informed judgment regarding the merits of the proposal.

The Corps' EIS in the instant case is a document 55 pages in length exclusive of exhibits and letters received from other agencies, and covers a great variety of subject matter. The first 16 pages are devoted to a discussion of the environmental setting without the project; the next 16 pages (Exhibit "B" hereto), constituting the heart of the impact statement, discuss the effects of the project in terms of the five elements required by § 102(2)(C); and the last 23 pages set forth comments of other public agencies and responses by the Corps. Environmental impacts were considered not only for the waterway as a whole but for each of its segments known as the river section, the canal section and the divide cut section. The Corps' overall conclusion was that the assessment did not reveal any detrimental effects significant enough to forego development of the project, and in fact the beneficial environmental impacts overshadowed the unavoidable adverse effects (p. 2).

The substantial grounds of plaintiffs' challenge to the adequacy of the EIS relate to the areas of (1) fauna, (2) water quality, (3) geology, (4) history and archeology, and (5) other detrimental effects upon riverine ecology. The court, therefore, must examine each of these areas in the light of the remarkable diversity of opinion expressed by experts tendered by both sides, bearing in mind that the burden of persuasion rests upon plaintiffs.

section may be added at the end of the review process in the final text of the environmental statement.)

(b) With respect to water quality aspects of the proposed action which have been previously certified by the appropriate State or interstate organization as being in substantial compliance with applicable water quality standards, mere reference to the previous certification is sufficient.

(c) Each environmental statement should be prepared in accordance with the precept in section 102(2)(A) of the Act that all agencies of the Federal Government 'utilize a systematic interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and decision making which may have an impact on man's environment." (Emphasis added)

26. Contra, EDF v. Corps of Engineers, supra, 325 F.Supp. at 759, which adopted the broader test.

### (1) *Fauna.*

The thrust of the testimony of several witnesses offered by plaintiffs is that the EIS failed to contain an ecosystem analysis based upon an accurate and complete inventory of all species of animal life within the area, documentation of their habitat and their function in the food chain, and an assessment of intermixing of the two river systems as it will affect each individual species as well as the ecosystem as a whole. Plaintiffs concede that the Tombigbee ecosystem contains a tremendous diversity of animal life and is, therefore, quite stable and resilient, but submit that each species is important to the maintenance of a balanced ecology by its interaction with other species in the life cycle. In addition, plaintiffs assert that certain species have special importance to mankind: commercially as a source of food, medicine and other products consumed by man; esthetically; symbolically; as an object of sport; or scientifically as a subject of classification and research. Thus, treatment by the EIS of each species is deemed to be important because the Tennessee and Tombigbee river systems contain endemic species of fish, birds, insects, mollusks and other benthic organisms, some of which are considered as rare or endangered species. According to plaintiffs, the project will probably cause the reduction, if not the elimination or extinction, of certain species, and the resulting shift in population patterns and reduction of diversity will have detrimental secondary effects on other animal life and on the environment as a whole. These are probable adverse effects which are said to be inadequately disclosed by the EIS.

We conclude that plaintiffs' foregoing attack upon the EIS is not valid because it assumes that every species has significance as a component of the ecosystem and thus merits discussion. The weight of the scientific evidence shows that in a diverse ecosystem such as the Tennessee-Tombigbee Valley, the great majority of species perform no unique role or function that cannot be performed by other species, and the increase, decrease, or even loss of a given species becomes significant only if the ecological balance is affected. The witnesses for plaintiffs and defendants were in sharp conflict on the classification and endemicity of certain animal life, and whether rare or endangered species do in fact exist within the project area. Assuming the correctness of the testimony of plaintiffs' witnesses, nevertheless we cannot accept the narrow view of the taxonomist who would attach significance to every species, irrespective of its role or function. It would serve no useful purpose to require the EIS to discuss those organisms which often can be found elsewhere, are of academic interest only to the specialist, and perform no special role or function. Indeed, plaintiffs' witnesses concede that years of research may be required to establish if there is any degree of functional significance to certain species alluded to by them. We find that the Corps' EIS is based upon the correct premise that the existing data on the faunas in the project area are adequate to identify the significant effects likely to occur to animal life as a result of the waterway proposal. Furthermore, this conclusion is reinforced by the realization that only a small percentage of the flow of the Tennessee River will be diverted to the project, much of the total length of the free-flowing streams in the Tombigbee Basin will remain unaffected, the resulting alteration of the total ecosystem will be in part only, and the Tombigbee Basin will continue to be inhabited by close relatives of any species, or subspecies, lost by reason of the project.

Particular adverse effects on species alleged by plaintiffs are that the continuous discharge of water from the Tennessee into the Tombigbee will result in certain species, such as the shortnosed gar, the Ohio lamprey, and the false map turtle, invading or being introduced into the Tombigbee River. The fear is that these species, alien to the Tombigbee, will successfully establish themselves and eliminate some existing species by com-

petition, introduce diseases not found in the Tombigbee area, and interbreed with existing species to produce hybirds which are less effective biological competitors. The claim is that the EIS does not reveal these problems and inaccurately concludes that "[m]ixture of botanical or other zoological forms is unlikely to result in an ecological imbalance." (EIS p. 24). The clear weight of the evidence negates the validity of this contention since invading species have less chance of succeeding in a foreign environment when they have to compete with native species. The text of the EIS concerning the present environment of fishes and other aquatic organisms and the effect of mixing marine life is not only detailed but substantially accurate. (EIS pp. 13, 14, 17, 19, 20, 22–24, 28).

Plaintiffs next assert that the EIS omits, or fails to disclose fully, adverse effects to the habitat of marine life resulting from the alteration of the Tombigbee River as a free-flowing stream and the creation of impoundments. The charges are that impoundments of water are conducive to an overabundance of rough fishes, such as carp and gar; that certain migratory fishes will be impeded by several locks and dams; that 7 species of fishes cannot survive in impoundments; that 5 species of bivalve mollusks and 5 species of gastropods are endangered and will probably become extinct; that a number of species of insects which make their habitat in moving water will be adversely affected; and finally, a substantial increase in mosquitoes will result from slack water habitat created by the impoundments. We think these matters are adequately discussed. First, the fish and wildlife species in the project area are mentioned in detail (pp. 13–15). Next, the EIS (p. 17) points out that in the river section there will be extensive loss of prime habitat for wildlife and several species of small fishes and states that the effects of the fishery losses will be mitigated by the establishment of lake fisheries consisting primarily of largemouth bass,

spotted bass, crappie, bluegill and catfish; and also, there will be an improved, managed habitat for water fowl. Fishery resources in the East Fork of the Upper Tombigbee (in the canal section) would remain largely undisturbed (p. 20). It is acknowledged that aquatic plant growth and mosquito production will increase in slack water, but they are not major problems and can be controlled (p. 18). Moreover, the loss of fish and wildlife habitat was specifically discussed in connection with comments made by the U. S. Bureau of Sport Fisheries and Wildlife (p. 37). The failure of EIS, however, to mention possible adverse effects on certain fish species, such as the shovelnose sturgeon, blue sucker, river redhorse, freckled-bellied madtom, speckled chub, river darter and freckled darter —species which according to the icthyologist witnesses are without particular or known ecological significance—does not vitiate the essentially correct disclosures made in this important area. The overwhelming evidence supports the Corps' judgment that the probable loss of certain species of fish in the Tombigbee as a free-flowing stream will be materially offset or mitigated by increased resources of game fish from the establishment of artificially created lakes. We are also of the view that the Corps' assessment of the project's effects upon the benthic community, consisting of mussels, clams, snails, crayfish, etc., has not been shown to be erroneous, even though the species were not not specifically mentioned in the impact statement.

Plaintiffs next challenge that the EIS fails to discuss the material effect of the changes of water temperature on aquatic animal life. We find this complaint to be wholly without merit for the impact statement offers a detailed discussion (p. 18) of the expected increase in water temperature, concluding that it will be minor and not a cause of concern to biota. The various factors involved in the Corps' reasoning to this effect appear to be specifically set forth in the impact statement, and its position there-

on was reemphasized in responding to the comments of the Environmental Protection Agency (p. 38).

Another specific area of criticism by the plaintiffs is that the EIS, in discussing suitable habitat for rare and endangered birds, (p. 14) not only omitted from its list two species, the bald eagle and the peregrine falcon, but inaccurately recorded the sighting of others. Needless to say, the evidence is replete with irreconcilable conflicts in an area dependent largely upon hearsay reports of bird watchers, but we are convinced that the Corps correctly concluded that the waterway project does not have significant adverse effects on the bird population. Unlike aquatic organisms birds have great mobility that enable them readily to seek other suitable habitat which will exist not only in undisturbed portions of the project area but in other portions of the southeastern United States.

(2) *Water Quality.*

On the subject of water quality, plaintiffs take issue in several respects with the Corps' conclusion that "[i]ntermixing of the water . . . is of no significance insofar as water quality is concerned." (EIS p. 23). First, plaintiffs say that mercury pollution is currently a serious problem in the Tennessee River and there is a likelihood that concentrations of mercury to be discharged into the Tombigbee will be a hazard to both man and animals. The EIS specifically discussed the mercury problem in the Pickwick pool and other portions of the Tennessee River (p. 11) and defended its views vigorously in response to comments of EPA (p. 39), Tennessee Department of Conservation (pp. 43, 44), and Mississippi Air and Water Pollution Control Commission (p. 48). These exchanges clearly alert the reader to the issue of mercury contamination. We find there is substantial evidentiary support for the Corps' view that the source of the mercury discharge into the Tennessee River by an industrial plant has been identified and eliminated, and on the basis of studies already carried out by Tennessee Valley Authority, the mercury deposit now in the Tennessee River will present no problem by the time the waterway project becomes operational.

Secondly, plaintiffs contend that Eurasian water milfoil, an aquatic weed associated with eutrophication (a process which causes water to become excessive in nutrient content and lacking sufficient dissolved oxygen to sustain aquatic fauna) will migrate to the Tombigbee from the Tennessee, and the bare mention of aquatic plant growth by the EIS and dismissing it as not a major problem are inadequate treatment of a significant harmful effect. The EIS acknowledges the introduction of Eurasian water milfoil into the Tennessee River in the early 1950's stating that it caused localized problems in certain reservoir areas having high carbonate content (pp. 24–25), but that only floating milfoil fragments, and not established plant populations, have appeared in the Pickwick pool (p. 16). The EIS then concluded that water in the Tombigbee seems to be only marginally capable of sustaining Eurasian milfoil and if the plant should be introduced via the waterway, its successful establishment appears doubtful (p. 25). The reader is alerted to this issue by the specific comment of the Alabama Department of Conservation and the Corps' response (p. 46).

Thirdly, plaintiffs challenge the sufficiency of the EIS treatment of the assimilative capacity of the stream, i. e., its ability to carry off pollutants. The impact statement discusses the assimilative capacity in detail (pp. 21–22, 28), and adopts the view that, because of the additional flow from the Tennessee and alterations to the ground water system, the waste assimilative capacity of the waterway will be significantly improved. At the trial, defendants offered competent and credible witnesses who supported the view that the assimilative capacity of the stream should not be adversely affected. Yet, opposing responsible opinions as to the assimilative capacity of the waterway and its water quality in general were expressed at length by EPA (pp. 38–42).

The concern of other agencies as to the pollutional effects of barge traffic and increased industrial operation was disclosed (pp. 40, 43). Stream pollution was thus presented as a controversial area, requiring special measures for efficient abatement (p. 41). Taken as a whole, the impact statement adequately disclosed to the agency, the decision-makers and the public the problems for maintaining acceptable standards of water quality.

### (3) Geology.

While plaintiffs offered no witnesses to directly refute the adequacy in which the EIS identified and discussed the effect of the project on geological resources in the area, the evidence indicates that the Corps is considering a proposed geological study by the Geological Survey of Alabama. Plaintiffs' suggestion is that the study will present additional detailed information with respect to the project's effect on geology, mineral and energy resources which should have been included in the EIS.

After close scrutiny of the EIS in this regard, we conclude that the plaintiffs' contention is patently erroneous. The EIS contains a detailed discussion of the geologic resources (pp. 3, 4), including paleontological sites (p. 4), and ground water distribution (p. 9) presently within the project area. The EIS recognizes that the project will adversely affect notable paleontological sites in the river section (pp. 19–20), and existing ground water distribution will be altered in both the canal section (p. 21) and the divide cut section (pp. 21–22). The impact on the ground water and paleontological sites is also identified as adverse environmental effects which cannot be avoided (p. 28). Particular mineral deposits in the project area which will be inundated are also discussed in adequate detail (p. 25).

The clear weight of the evidence shows that the Corps availed itself of an abundance of geological data from such sources as the United States Geological Survey and the Geological Survey of Alabama and presented the syntheses of this data in the EIS. After review of the EIS, the U. S. Geological Survey considered the discussion on ground water to be a factual, quantitative evaluation (p 36); the Geological Survey of Alabama concluded that the EIS was basically fair and honest and discussed both favorable and unfavorable geological effects with no apparent omission (p. 47). There is no indication that the results of the proposed survey to further evaluate the geological resources in the area will alter the Corps' conclusions in the EIS; rather, the clear intent of the further study is to aid in the reduction or elimination of adverse effects to the geological resources which have already been identified in the EIS.

### (4) History and archeology.

A serious challenge by plaintiffs is that the EIS does not discuss in proper detail the impact of the waterway upon the historical and archeological sites affected by the project. The impact statement recognizes that archeological remains, principally of Indian origin, and antebellum homes, are widely distributed along the route; that a preliminary survey indicates that more than 20 sites of archeological interest exist in Alabama in the area of the proposed Gainesville lock and dam; that although no recent Mississippi survey has been made, numerous sites along the waterway alignment in that state have been located and described (pp. 4–5). The impact statement expresses a concern for the need to survey archeological sites in areas not excavated but used for disposition of spoil (p. 23). Finally, the EIS, under the heading of unavoidable adverse effects, states that the project will result in the loss, either total or partial, of "several archeological and historic sites", to be located and documented upon the implementation of the project and salvage activities of endangered sites carried out before their inundation (p. 28).

Professor Marshall of Mississippi State University, plaintiffs' archeology witness, termed the foregoing discussion as an inadequate disclosure of the significant archeological effects that the

project is likely to have, and thought that detailed surveys of the entire project area were necessary for the EIS to portray a proper assessment of the impact. Because of the documentary evidence, however, the court concludes to the contrary and finds that the Corps had available adequate backup data on historic and archeological sites, and the views expressed in the EIS are consistent with that research. There can be no doubt that the Corps might implicitly rely upon the survey carried out by the Department of the Interior in the Gainesville, Alabama, area, and had similar surveys of the other proposed reservoirs been made, no factual issue could arise as to the sufficiency of the underlying historical and archeological data. Budgetary limitations apparently precluded the Department of the Interior from surveying the entire area at one time. The absence of a comprehensive federal survey was met in substantial part by a survey carried out in May-June 1970 by the Mississippi Archeological Survey, of which Professor Marshall was the director (P. Ex. 47). This project, entitled "Archeological Survey in the Tombigbee River Drainage Area", located and documented 76 sites of interest, only 13 of which had been previously recorded (P. Ex. 47, p. 27), and recommended further survey work for other sites in the path of the waterway.

Upon the recommendation of the National Park Service and the Corps of Engineers, the Tombigbee River Valley Water Management District arranged with the Mississippi Department of Archives and History for a further archeological study. Professor Marshall, also associated with this undertaking, anticipates that the current survey should document more than 100 sites, but this information, unlike his earlier survey, was not available to the Corps at the time of preparing the EIS. The court concludes that the EIS does identify in adequate terms the project's substantial impact upon the historic and archeological sites of the area and its unavoidable adverse effects. The current investiga-

tions will not disclose data that will alter or modify the conclusions reached in the EIS, but will serve to refine special problems and ameliorate the potential adverse effects.

(5) *Other detrimental effects upon riverine ecology.*

At the risk of unduly prolonging this opinion, we consider plaintiffs' other claims of significant adverse effects upon Tennessee-Tombigbee riverine ecology, such as the disposition of spoil, extent of waterlogging, creation of oxbow lakes, disturbance to flood patterns and meandering processes, and reduction of sediment flow to Mobile Bay.

The EIS is attacked because it fails to disclose a method or methods of disposing of 260 million cubic yards of excavated dirt in a way that will not adversely affect the environment. The excavated material presents a major environmental problem, as conceded by the Corps. The EIS has considerable comment regarding spoil (p. 23), referring to the large quantities of excavated material from the divide cut, river and canal sections, and stating that "present plans call for the excavated material to be wasted adjacent to the cuts". The spoil is thus identified as a significant impact, for the proper disposition of which judicious planning will be required (p. 31). The EIS further states that "the optimum methods for the disposal of all this material have not been determined", and various proposals were under consideration for utilization of the excavated material in a most advantageous manner, to enhance the present environment. These alternative methods are discussed in considerable detail (p. 23). The evidence convinces the court that environmental design arts are being employed in the project's advanced engineering stages which will lessen the potential adverse effects of the spoil. Contrary to opinions expressed by some of plaintiffs' witnesses, it would be wholly impracticable to require that the ultimate environmental design for the disposition of this material be included

in the EIS. To rule otherwise would require an agency to compile virtually complete engineering data merely to prepare an impact statement. An undertaking of such magnitude is beyond the scope of § 102(2)(C).

Botany specialists offered by plaintiffs criticized the EIS for inadequately discussing waterlogging, i. e., excessive water saturation injurious to trees and plant growth. The EIS points out that in the vicinity of the river section "some localized waterlogging may occur in low areas" (p. 19); that "resulting waterlogging in some areas" of the canal section might occur from new or altered sources of ground water (p. 21), but such waterlogging should be of "no major significance" (p. 28). The claimed inadequacy is that the EIS failed to state the quantity and location of the acreage subject to this hazard, an omission which is said to be important since not more than 40,000 acres will be in lakes out of the total 70,000 acres committed to the project. To answer this criticism, the EIS would have to include topographic maps of the entire area and backup data on land use, water levels and soil content. There was no showing that the Corps did not have proper maps and adequate data to justify its conclusion. To require the inclusion of such corroborative material in the EIS merely to explain what is meant by "localized waterlogging" would be without useful purpose.

We summarily reject the claim that oxbow lakes are not sufficiently mentioned in the EIS as a significant effect of the project. Indeed, oxbow lakes are twice discussed. First, it is noted that 20 miles of oxbow lakes will be created in the river section; that they are "subject to accelerated siltation"; and "measures will be taken to alleviate siltation so that the oxbow lakes will make a positive contribution by providing waterfowl habitat and fishing sites off the traveled navigation route" (p. 17). Next, it is stated that 3.4 miles of oxbow lakes made by cutoffs in the canal section "will not create significant problems" since the nearby 53-mile portion of the East Fork of the Tombigbee River in Itawamba County, channelized in 1940 for flood protection, continuously forms natural oxbow lakes (p. 21). These direct references to oxbow lakes and their tendency to rapidly fill with deposits of silt are sufficient to put anyone on notice of the adverse effects of the cutoffs made at the indicated locations on the Tombigbee River.

Plaintiffs also assert that the EIS fails to disclose the adverse effect of alterations in the Tombigbee's flooding and meandering processes, which create diverse natural habitat and are important for the maintenance of a self-sustaining riverine ecosystem. This claim ignores the EIS's detailed description of the project (p. 1). The EIS clearly indicates that the Tennessee-Tombigbee project will be a run-of-the-river system with no flood control capacity (pp. 1, 18). Thus it is axiomatic that the Tombigbee's natural flood plain will be affected only slightly. The EIS states that portions of the canal section would be threatened by the meandering tendency of the East Fork of the Tombigbee River and cutoffs will be provided to alleviate this threat (p. 21). By a profile map attached to the EIS, one can determine what sections of the river are to be impounded, the general location of the dams and locks, the distance between the dams and locks, the normal pool locations at the proposed dams and locks, and approximately what portion of the river would still flow within the present banks of the Tombigbee River. This is sufficient information to inform the reader as to the project's effect upon the river's natural flooding and meandering processes.

A final potential damaging effect upon riverine ecology which plaintiffs declare to be absent from consideration in the EIS is the alteration of sediment flow to the coastal plain of Mobile Bay. It is argued that estuaries of the coastal plain, where the fresh water of the Tombigbee meets the salt water of the Gulf Coast, contain abundant biota dependent on the

quantity and quality of dissolved organic material and other sediment deposited there from the upper reaches of the river. In plaintiffs' view, the EIS failed to include reasonable estimates of the changes in sediment flow to the Mobile estuarine area and the resulting probable effect of such alterations on the estuarine ecology. Examining the EIS, we conclude that plaintiffs' argument is clearly not justifiable. The natural sediment flow to Mobile Bay, the probable alteration of the flow by construction of the project and intermixing of the river system, and the effect on the estuarine ecosystem are discussed in ample detail as an environmental impact of the proposed action. (pp. 17, 25). Additionally, the particular subject of silt wash to the Mobile area resulting from construction of the project is considered in response to critical comment from the EPA (p. 40).

■ Other criticisms which plaintiffs level at the EIS are of lesser importance and do not require discussion. It is sufficient to say that such objections, both collectively and singly, are not well founded and are therefore rejected. When the EIS is perused in its entirety, including the independent and often opposing views of the other public agencies, we believe that the document provides an adequate, detailed statement of the environmental impact and adverse effects likely to occur from the waterway project. The reader is thus enabled to gain a true perspective of what is bad as well as what is good in terms of the environmental consequences—the intended purpose of a § 102 statement. Furthermore, the court approves the adequacy of detail and the factual accuracy of the EIS discussion of alternatives (pp. 29–31), short-term uses versus long-term productivity (p. 31), and the irreversible and irretrievable commitment of resources to the project (p. 32).

*Section 102(2)(D).*

Plaintiffs claim without elaboration that the Corps has failed to "study, develop and describe appropriate alternatives" to the waterway proposal as required by this subparagraph. We find this charge to be without merit for two reasons. First, the clear weight of the evidence indicates that the Corps has maintained a continuing program to "study, develop and describe appropriate alternatives" to the entire Tennessee-Tombigbee project as well as particular aspects of the project which will result in potential adverse environmental effects identified in the EIS. Secondly, the EIS contains a detailed discussion of the alternatives both within and outside the framework of the project (pp. 29–31). We find that this discussion is a sufficient *analysis* of those alternatives studied and developed pursuant to § 102 (2)(D).[27]

## CONCLUSION

On the basis of our study of the lengthy record made in this cause, and the relatively few decided cases construing NEPA, we conclude that the Corps of Engineers has not violated any provisions of federal statute law which preclude it from proceeding with the project. Indeed, we find that the Corps has fully complied with NEPA's standard of comprehensive and objective environmental management in respect to the Tennessee-Tombigbee Waterway project, including the establishment of an interdisciplinary approach and purposeful methods and procedures, and has prepared a detailed statement of the environmental consequences of the proposal. It follows that the preliminary injunction heretofore issued in this cause should be dissolved and the complaint dismissed with prejudice.

An order will be entered accordingly.

27. The relationship between the requirements of § 102(2)(C)(iii) and 102(2) (D) is described in the CEQ interim guidelines, supra, Fn. 25.

EXHIBIT "A"

TENNESSEE-TOMBIGBEE WATERWAY
ALABAMA AND MISSISSIPPI
CONTIGUOUS COUNTIES

[A6330]

## EXHIBIT B

## EXCERPT FROM ENVIRONMENTAL IMPACT STATEMENT

4. *The Environmental Impact of the Proposed Action.* The implementation of the project requires the commitment of approximately 70,000 acres of land which presently are in forests or are used for agricultural pursuits. Of this amount about 24,000 acres would be fully committed with the remainder committed in varying degrees. The latter, which is presently planned to be procured by permanent easement, will not be completely removed from the agricultural and forest land base. The bottomland hardwood and other forest areas which are cleared or killed by inundation will be lost for future timber production. About 40,000 acres of water surface will be created as a result of the project. Within the confines of the newly established lakes about 170 miles of tributary streams and 140 miles of the main stem of the Tombigbee River will lose their identity as free-flowing streams. The distinctive environmental impacts for each section of the Waterway are discussed under separate headings below and those common to more than one section are discussed under "General Impacts."

a. *River Section.* In the river section the conversion from land to water surface of about 21,500 acres will result in losses of prime wildlife habitat and hunting areas and the loss of approximately 136 miles of tributary streams which provide habitat for several species of small fishes. The effects of these fishery losses will be mitigated by the establishment of lake fisheries consisting primarily of largemouth bass, spotted bass, crappie, bluegill and catfish. Opportunity for managed habitat for waterfowl will be greatly increased as well as waterfowl hunting.

Approximately 20 miles of oxbow type lakes will be created within the river section with one-half of this mileage contained within one cut-off, Rattlesnake Bend, located approximately 40 miles downstream of Gainesville Lock and Dam. These cut-offs reduce the navigation mileage and reduce the amount of channel widening which would be required. The principal river flow will be diverted through the cut-offs and the oxbow portions are subject to accelerated siltation. Measures will be taken to alleviate siltation so that the oxbow lakes will make a positive contribution by providing waterfowl habitat and fishing sites off the traveled navigation route.

The Tombigbee River contributes a heavy natural silt load to the Mobile Bay estuarine area primarily from tributary streams. These highly turbid waters are due to natural soil conditions and poor land management practices. As land practices improve and more land reverts to woodland, the overall erosion within the basin will lessen. This reduction in erosion coupled with the new lakes' ability to function as "sediment traps" will cause an overall reduction in the total sediment load now imposed on the estuary. All newly exposed cuts will be graded to provide erosion protection. Vegetation will be removed only in areas where it may be a hazard to navigation or public health. Most of the cut sections will be completely submerged within the impoundments and will not be subjected to alternate wetting and drying which is conducive to erosion. No increased erosion will be noted below the "run of the river" locks and dams since the increased cross-sectional areas of the new channels will decrease current velocities and will reduce the tendency to scour.

During certain phases of construction including channel widening increases in turbidity will be significant. Careful planning and coordination will minimize this increase and acceptable levels can be maintained to assure that micro and macro fauna will not be permanently damaged. Areas disturbed will be stabilized and grassed. Following completion of structures and channels and the filling of lakes, the turbid conditions will decrease and return to satisfactory and probably improved conditions.

The maintenance of minimum water levels in the lakes upstream of each dam assures the availability of surface water for non-consumptive uses on a year-round basis assuming that adequate treatment is provided prior to return of the water to the waterway. The high ratio of inflow to storage volume for the projects in the river section indicates that thermal stratification will not be a significant factor in anticipated water quality with the waterway in operation. River current velocities will not be stopped but only decreased. Consequently, turbulence will be maintained throughout the entire water column and thermal and chemical stratifications cannot develop. Increases in water temperature will be minor and will not be of a magnitude which will cause concern as to maintenance of water quality or biota. The total available oxygen due to larger volumes and surface areas, coupled with other factors of reservoir dynamics, will more than offset any reduction in re-oxygenation capacity due to reduced velocity and temperature increase. In addition, flows provided by lock operation will significantly supplement the critical low flows during hot, dry weather even during times of minimum operation. The increases in time of travel and settling rates associated with reduction in average velocity under slack water conditions will cause a progressive reduction in bacterial levels. No degradation to the extent of violating established stream standards and classifications is anticipated and the water quality will be improved in many areas to the extent that use classifications can be upgraded.

As an indirect benefit the series of four dams in this section provides the opportunity for an incremental replenishment of dissolved oxygen, and an associated improvement in water quality, as a result of the aeration obtained in the spillway discharges at each dam.

Aquatic plant growth and mosquito production will increase in the slack water but will not be a major problem and can be controlled through normal operations in mosquito and aquatic plant control.

Coarser stones, pebbles, and sand that can be rolled by the current form an unfavorable substrate for colonization by algal Aufwuchs and an unsuitable habitat for much animal life, although a few species are adapted to these conditions. Therefore, a reduction in velocities can, under suitable circumstances, bring about a richer bottom life. Not only will the stones and sand remain stable, but also the lighter organic particles suspended in the water will be settled. In the presence of adequate oxygen resources, a rich benthic community will develop. Thus, the energy input characteristics of the free-flowing stream will be essentially preserved since the sediment will be continuously enriched with allochthonous organic material.

Since some decrease of turbidity is expected, the phytoplankton community will become more important within the stream ecosystem. Coupled with a rich benthic fauna, the diversity of the producers and primary consumers will be increased adding to its ecological stability.

The raising of the normal water surface elevations will cause an increase in the recharge rates of existing ground water aquifers, thus providing a more stable supply. Some localized waterlogging may occur in low areas in the vicinity of the project. Also, surcharging action upon some aquifers near the project may raise the normal water levels in some water wells.

Several important paleontologic sites are located along the Tombigbee River within the river section of the Waterway. The proposed lock and dam near Columbus as tentatively sited would establish a low water level at Plymouth Bluff approximately 29 feet above the present low water level. Over half of the exposed Eutaw Formation, including the bench and two other fossiliferous strata would be inundated. Four of the seven strata exhibited at the bluff would no longer be available for study and the bench

would be lost as a working platform and recreational site. The bluff would lose its attraction for visiting study groups from other areas as well as most of its value as a teaching-research site for local universities and its natural beauty and recreational usefulness would be drastically reduced. Efforts will be made to avoid this loss during design and construction of Columbus Lock and Dam.

The basal layer of the Tombigbee sand member of the Eutaw Formation at Barton's Bluff, one-half mile downstream from Barton's Ferry, may be inundated by the Columbus pool. This stratum contains shark teeth and vertebrate bone fragments. Also a portion of the Tombigbee sand member at Vinton Bluff, two miles upstream from Barton's Ferry, will probably be submerged. The lower stratum contains some seven species of marine fossils and shark teeth. Another section of the Tombigbee sand member below the bridge of the St. Louis-San Francisco Railway, at Aberdeen, containing five species of fossils will be partially inundated.

The Aberdeen pool will inundate the lower third of Blue Bluff, located about three miles north of Aberdeen. Seven species of typical Tombigbee sand member fossils along with shark teeth are found at approximately the same level as the normal pool elevation.

The only fossil site in the Selma Chalk that will be submerged is located in the western end of Union Bluff in Lowndes County where the Aliceville pool will inundate a bed of *Ostrea plumosa* Morton.

The widening of the Tombigbee River for navigation may involve fossil sites not affected by the increased water levels. Also the proposed cut-offs may expose undiscovered fossil beds now located beneath the overburden. Detailed environmental studies now in progress will add further knowledge as well as providing evaluation of the feasibility of protective measures, including resiting of structures.

b. *Canal Section.* Construction of the canal requires clearing of approximately 3,000 acres of bottomland and other wildlife habitat. Clearing for agricultural purposes has already altered much of the habitat. Some bottomland has been cut over and planted in pine which is less desirable than hardwoods as habitat. The canal section offers two wildlife enhancement possibilities. First, the State of Mississippi is planning an 11,000 acre wildlife management area to be created on lands between the canal and the East Fork of the Tombigbee. Studies being made will determine the extent to which the project can provide intermittent flooding of the waterfowl areas. This area, the John Bell Williams Game Management Area, will provide wildlife habitat and waterfowl nesting areas, and will increase waterfowl hunting opportunity within the project area. When considered in conjunction with the Noxubee National Wildlife Refuge to the west, T.V.A. to the north, and the Eufaula and Apalachee Wildlife Management areas and the Choctaw waterfowl area to the east, a greater attraction will be provided for waterfowl from the Mississippi and Atlantic flyways and will provide greater potential for the National Migratory Bird Management Program. Second, the canal will create approximately 75 miles of "edge" which can be managed for wildlife and will provide opportunity for pursuit of recreation activities. Several private power companies have been successful in applying this concept to cleared areas associated with high voltage transmission lines. As wildlife populations within or near these areas increase in density, they serve as distribution centers for wildlife radiation into the adjacent regions. Large box culverts, to be constructed to carry streams under the canal, will provide crossing points for wildlife.

Fishery resources in the East Fork of the Tombigbee will remain much like the present since disturbance is being held to a minimum through use of the lateral canal. The canal section will also provide opportunity for recreation although the total extent to which a well rounded fishery will be established is not

known. An increased opportunity for a bank-type fishery will exist if the fish populations are available. The effects of the loss of approximately 22 miles of drowned tributaries will be mitigated by a tailwater-type fishery which will develop in the spillway areas. Shallow areas within the perched canal will be conducive to aquatic plant growth if turbidities are low, but this growth can be controlled by normal methods should it become a problem. Periodic barge traffic through the canal will create an extensive "splash zone" conducive to the propagation of nuisance species such as non-biting midges.

The water in this section will be subjected to a high degree of mixing from turbulence produced by propeller action. This coupled with the flow due to lockages will provide sufficient interchange of the water at the air-water interface to maintain adequate dissolved oxygen concentrations of the waters of the canal. Increases in turbidity will probably take place due to this turbulence also.

The canal section will be a new source of ground water recharge. The reaches where the canal consists of parallel levees will act as line sources of recharge to the underlying alluvium, terrace deposits, or older material and will result in increased ground water levels on both sides of the canal. In reaches where the canal is formed by a levee on one side and the valley wall on the other side, most of the alluvial material on the valley wall side will be submerged, with resultant waterlogging in some areas. The total seepage from the canal section is estimated to be about 360 cfs, most of which will be available for ground water recharge. These alterations to the ground water system will produce increases in the dry-season flow of streams below canal level and, therefore, increase the assimilative capacity of these streams. Construction of the canal section will change the point of discharge of many small streams, causing local alteration in flow patterns and although some surface water will be intercepted by the canal, most will be diverted a short distance and discharged into small tributaries of the East Fork. Lockage water from Bay Springs in excess of the requirements of the canal will be diverted to the East Fork which will assure maintenance of fisheries and sustain low flow as required by the State of Mississippi.

Portions of the canal would be threatened with encroachment due to the meandering tendencies of the East Fork of the Tombigbee. To alleviate this threat, cut-offs will be provided. Since 53 miles of this stream in Itawamba County were channelized in 1940 to provide flood protection and the stream continuously forms natural oxbow lakes, the additional 3.4 miles of oxbows created by these cut-offs will not create significant problems.

c. *Divide Cut Section.* The actual connection of the Tennessee River and Tombigbee River Basins will take place in the divide cut section of the project in northeast Mississippi. In this area, the elevation of the divide is about 570 feet above mean sea level. The elevation of the bottom of the connecting canal will be 395 feet above mean sea level, thus requiring a cut of approximately 175 feet. The majority of this cut will be through stratified sands and clays of the Eutaw formation. A cut approximately 40 feet deep through this material has been made by the Illinois Central Railroad, which crosses the divide about 200 feet to the east of the location of the authorized waterway, apparently without any adverse effects on the ground water system in the area. Due to its greater depth, the divide cut for the project will act as a drain for water table aquifers in the area, thus lowering the water table for some distance on each side of the cut. An artesian aquifer will be encountered in the lower part of the divide cut which may affect the head and quantity of water available downdip and change the artesian condition to a water table condition updip. These changes in artesian pressure can be transmitted for great distances through the aquifer but there is a possibility that local geologic conditions may preclude or

greatly reduce any such effects. The Bay Springs Lake will ultimately increase the ground water supply, as ground water discharge to the stream will be decreased and recharge to aquifers will occur. This will take place with time. Ground water will initially discharge into the lake, first rapidly then at a decreased rate. The filling of the lake will increase the amount of ground water in storage, thus enhancing the resource. The water in the lake may have slightly different chemical characteristics than the water now recharging the aquifers; however, the lake water will be of good quality and no adverse conditions are expected to occur. The aquifers affected by the lake and the divide cut are in the same total system and the magnitude and areal extent of these effects is not certain at the present time. Engineering and environmental studies are currently underway to more accurately define the effects of the divide cut upon the ground water hydrology and the additional measures, if any, which will be needed to counteract any major detrimental effects.

Based on a maximum usage of 24 lockages per day, 1,246 cfs will be transferred from the Tennessee to the Tombigbee Basin. Although this water will no longer be available for electric power generation or other uses in the Tennessee River Basin, the increased flow provided to the Tombigbee will permit year-round navigation, supplement the waste assimilative capacity of this river, and have beneficial effects on the fisheries. Since the ability of the Tombigbee River to assimilate waste loadings during low flow periods may be the controlling factor which would limit future development, the availability of this additional flow gains importance. This additional 1,246 cfs is approximately nine times the lowest seven-day discharge, 141 cfs, of the Tombigbee River at Columbus, Mississippi, during the 53 years of record. The chemical water quality characteristics of the two watersheds are so similar that the mixing is not expected to create a recognizable change in the concentrations of the chemical constituents of the Tombigbee River. The Bay Springs Lake is expected to stratify and measures will be incorporated to assure that the dissolved oxygen of release waters will be maintained at an acceptable level.

The divide cut section including Bay Springs Lake will remove or inundate about 15,000 acres of forest and other suitable wildlife habitat. Creation of Bay Springs Lake will inundate approximately 6,800 acres of land and approximately 31 miles of Mackeys Creek and tributaries. However, most of the forest affected is of moderate value for wildlife, especially game animals. Loss of opportunity for stream sport fishing will be mitigated by opportunities offered by Bay Springs Lake. The canal northward of the divide will effectively eliminate portions of Yellow Creek as a topographic entity. Sixteen miles of the creek will be replaced by the navigation channel. However, the creek is presently channelized throughout much of its length and equivalent opportunity for bankfishing should exist along the new channel. Fishes dependent upon moderate to swift currents will be eliminated since upstream migration will be largely unsuccessful in the remaining intermittent tributaries.

d. *General Impacts.* The impacts discussed thus far have been associated primarily with a particular section of the Waterway. Many of the impacts which affect one section are common to or naturally influence what occurs in other sections and also affect the overall project. The impacts which are discussed in the remainder of this section are considered to be primarily of a multi-section, overall project, or regional significance.

Falling in this category is the disposal of the large quantities of excavated materials in excess of those required for construction fill. It is estimated that these amounts are approximately 140 million cubic yards for the divide cut, 70 million cubic yards for the river section and 50 million cubic yards for the canal section. Present plans call for the excavated material to be wasted adjacent to

the cuts. However, the optimum methods for the final disposal of all this material have not been determined and a significant amount of the total environmental and engineering studies effort will be devoted to this matter. Possible methods include use of some of the material as fill for roads and highways, rehabilitation of blighted areas, such as abandoned gravel pits and eroded gullies, filling and site preparation of industrial and commercial sites, and for other varied uses. It is also possible that some of the excavated material could be deposited in the Bay Springs Lake, thus reducing the depth of the lake and the possibility of stratification. These preliminary investigations indicate that the efficacious handling of this material will present numerous opportunities to provide both short-term and long-range environmental improvements. Disposal areas will be surveyed for archeological sites and close coordination will be maintained with State and Federal agencies having responsibility for archeological and historical resources.

In-depth studies are being proposed which will generate land-use plans to best meet the needs of the area. The Tennessee-Tombigbee Waterway Development Authority has engaged a private research organization to assist in the preparation of a proposal to obtain Federal financial assistance for conducting a planning program in the field of land use. The conclusions and information derived would augment and provide an opportunity for introspection of the concurrent environmental studies.

Connection of the two river systems will provide a means for exchange of water and aquatic biota between the two systems. Intermixing of the water is discussed in the previous paragraphs and is of no significance insofar as water quality is concerned.

Although there will be some movement of fish from the Tombigbee River into the Tennessee River, the most probable movement of fishes and other aquatics will be from the Tennessee into the Tombigbee. The smallmouth bass is the only game fish present in Pickwick pool that is not already present in the Tombigbee. Although several other species of game fish are found in the Tennessee Basin, they are primarily mountain stream or coldwater species and cannot survive in the main stream of the Tennessee River. Therefore, these coldwater species do not warrant further consideration. Sauger and white bass, which occur in the Tennessee, have recently been introduced near Aberdeen by sport fishermen. Adverse effects of these transplants on naturally occurring members of the Tombigbee fish community have not been documented but are thought to be nominal or possibly absent. While the white bass has established fishable populations in some areas, the sauger is rarely taken in the fishery but should provide good fishing after completion of the waterway. The smallmouth bass, if introduced via the waterway, will probably establish in a manner similar to the white bass.

A study has indicated that most fish species shared by the two river systems will not be altered to a great degree. Several species found in both the Yellow Creek and the upper Tombigbee Basins are presently considered to be subspecifically distinct. Bay Springs Lake will probably become a zone of interbreeding of these species. The second phase of the comprehensive environmental study will include detailed taxonomic investigations to determine effects of the intermixing of these races.

In addition to the smallmouth bass, six species of minnow-type fishes are possible colonists to the Tombigbee from the Yellow Creek Basin. Included are five minnows of the genus *Notropis* and one darter, *Etheostoma kennicotti*. Six colonists are available from the Tombigbee Basin to Yellow Creek, if they are capable of surviving upward migration through the canal section and Bay Springs lock. These are also of the genus *Notropis*. Results of the possible mixture of these species is unknown at present but will be studied prior to joining the two river basins.

Mixture of botanical or other zoological forms is unlikely to result in an ecological imbalance. Aquatic species comprising these broad taxa tend to be distributed regionally and it is unlikely that significant difference in species composition exists. This is particularly true for the microscopic phytoplankton and zooplankton communities since most species are readily transported by wading birds or even the wind when in resistant stages in the life cycle.

Larval insects are a major constituent of the stream benthos. Since adults are relatively widespread, this community is expected to be similar in both river systems. Even if some species in the two-river systems are different, the effect of their mixing is expected to be minor. Several studies have demonstrated that the number of benthic species remains relatively constant over a period of time, although the kinds of species may vary rapidly. This high possibility of species change at a given trophic level indicates that a large number of taxa may perform the same function in the community but at different times. Consequently, those species best adapted to a given set of ecological conditions will be the ones performing the function at that point in time. As a result, most benthic species have more than one prey and, in varying degrees, are generalists. Therefore, if a species is interchanged, it will probably fit into its appropriate ecological niche and additionally be utilized by higher trophic levels.

Eurasian watermilfoil was introduced into the Tennessee River in the early 1950's and has since caused some serious, but localized, problems. Populations have established in the Watts Bar, Guntersville, and Wilson Lakes. It is found in Wheeler, between Guntersville and Wilson, and Pickwick, downstream from Wilson. Success of the exotic plant is apparently related to the carbonate content of the reservoir. Guntersville, which has the highest carbonate content, also has the most severe infestation. The plant seems to be characteristic of waters

in which the hardness exceeds 50 mg/1. This has been partially verified in Florida on the Crystal River. Water in the Tombigbee seems to be marginally capable of sustaining significant Eurasian watermilfoil infestations, and should the plant be introduced via the waterway, successful establishment appears doubtful.

Gravel pits located on the Tombigbee River in Lowndes, Clay and Monroe Counties will be affected when the normal pool elevations in the river section are attained. Alluvial deposits upstream from Columbus will be the ones most threatened with inundation. A portion of this material can be utilized in the construction of the project. Deposits of foundry sand and tripoli in Tishomingo County, bentonite in Monroe County, and limestone in various counties along the Waterway also will be affected to some degree due to possible inundation. However, in most instances, development of the Waterway will enable increased utilization of the minerals in the area since low-cost transportation will be provided for bulk commodities.

The Waterway will inundate several dry holes (drilled for oil) including one within the Bay Springs Lake area and another within the canal section. These holes will be sealed before inundation. Several producing oil wells in the Beans Ferry Field, Itawamba County, are also located near the Waterway but no interference with their operation is expected to result from the project.

It is anticipated that some sites having historical or archeological significance may be directly affected by construction of the Waterway or by the permanent flooding of lands. Archeological investigations and salvage activities at endangered sites will be conducted prior to their disturbance or inundation. The location and preservation of culturally and historically valuable antiquities and artifacts will gain impetus from implementation of the project.

Some effect of project implementation will be noticeable in the Mobile Bay area

where the estimated ten-year seven-day low flow of the Mobile River system is 8,000 cfs and the average flow is above 60,000 cfs. The added flow from the Tennessee River for lockages will have little effect upon the estuarine ecosystem and the high quality of the additional water will be beneficial. Barge traffic and industrial growth related to project development, however, will increase possibilities of damage to the estuary from accidental spills and increased pollutional loads. These possibilities will be minimized through precautionary regulations established by state and Federal enforcement authorities.

At localized sites the air resource will be temporarily contaminated from open-burning which must necessarily be conducted during various stages of construction. The State of Alabama indicates that open-burning probably will not be a major problem along the Alabama waterway segment. The State of Mississippi will require that open-burning in Mississippi be conducted at remote sites under favorable meteorological conditions and monitored by the State Forestry Commission.

Once it becomes operative, the project with its control structures will have an insignificant effect upon the air resource. By far the most severe adverse effect on this resource will precipitate from subsequent activity developing around and along the Waterway. The severity of this problem will be inversely proportional to the efficiency of the control exerted by local, state and national regulatory agencies.

Construction operations during development will create some interruption in established life patterns and inconveniences to the local populace. Mostly these will be localized and of short duration. Proper planning will alleviate many of the unpleasant circumstances associated with construction operations and environmental protection provisions incorporated in the project plans and specifications will minimize the occurrence of objectionable environmental conditions.

Highway and road relocation due to project implementation will cause some inconvenience and may have some economic effect on highway transportation of the area. Environmental effects of highway rearrangement will be controlled and will be minor. Final design will be coordinated with the National Park Service in connection with the Natchez Trace Parkway crossing below Bay Springs Dam to assure aesthetic quality and prevent adverse effects.

The increases in both the development and activity along the Waterway will generate a permanent elevation of noise levels. These increases will be greatest in the vicinity of urban areas. The establishment and enforcement of standards, zoning ordinances and land-use plans will aid in preventing this factor from becoming a serious problem.

An indirect impact which may result from the project is the increased danger of spills of contaminants and increased pollution loadings. This impact can be controlled through proper surveillance and enforcement by state and Federal water pollution control authorities.

One of the more significant impacts will be the effect that the Waterway will have upon the economy, culture and education of the human resource located within the project area. These people, having endured a long period of economic and social repression, view the project as an economic cure-all. Thus, there will be a tremendous bolstering of morale through faith that the Waterway will provide a foundation on which to build the future. Beginning with the construction phase, when the local populace will become directly involved with the project, an economic and social impetus will be set in motion that will gain momentum as the project develops; this impetus will be sustaining through many future generations.

The secondary effects to the economy, the results of commercial and industrial development along the Waterway, will be more perpetuating and more significant than those received from the actual construction. The total economic im-

pact will be far-reaching and felt on a regional basis as the aspirations shared by Alabama, Mississippi, and adjoining states are fulfilled.

Although relatively few in number, the people who now live within the proposed route of the Waterway must be relocated from their homesteads and have areas intimately associated with their lives and heritage inundated. This could be a detriment or a benefit depending primarily upon the age of the person involved. For the most part, the human being is adaptable, flexible and committed to change. For some, this move may offer hope of a solution to an otherwise unsolvable plight; for the more elderly persons it may be a traumatic experience. It is estimated that approximately 150 families in the river section and 80 families in the canal section will be affected. For those who will experience being relocated as an emotional shock, the efforts through the extension services of the counties along with other social-welfare programs will aid in the mitigation of these effects. Although the information is not yet available, it is believed that in some instances lands will be taken for the project which are the only sources of family income. For those who lose their incomes because of the project, rehabilitation and vocational training programs will be needed. Public assistance programs and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91–646, will provide help to individuals and families with relocation problems.

The demand for a higher quality of cultural and recreational opportunities will be intensified as educational levels increase and anticipated economic and social improvements are realized. These can be partially fulfilled through the development and expansion of private cultural and recreational facilities. Utilization and enjoyment of the natural recreational resources of the area will also be promoted by development of public recreational facilities. Approximately 10,000 acres of project lands have been designated for this purpose in the form of public use areas and access roads along the Waterway. Initial public use facilities to be provided by the Corps of Engineers will include camping areas, picnic and comfort station areas, bathing beaches, nature trails, boat launching ramps, and overlooks. The 40,000 acres of surface water will be accessible to all where now most of the ponds and small lakes in the vicinity of the project are presently under private ownership and not available to the general public.

The project has an exceptional potential for development of associated general recreation facilities by local, state, and Federal agencies and private interests. Many developments will be made possible or at least encouraged as a result of project implementation. The complete development of the John Bell Williams Game Management Area is dependent upon the Waterway providing a source for periodically flooding the area for waterfowl habitat. Planning of this area has centered around the Natchez Trace Parkway to provide access and the Pharr Indian Mounds which are being emphasized as a center of tourist attraction. Recreational resources and developments associated with the project, together with its uniqueness as an engineering feat and point of general interest, will augment the attractiveness of the area as a center for pursuing leisure activities. Bay Springs Lake particularly will complement the recreational opportunities available at the Tishomingo State Park.

5. *Any Adverse Environmental Effects Which Cannot be Avoided.* Construction of the project will require 70,000 acres of land for development and subsequent operation and maintenance. Approximately 56,000 acres of these lands are forest and timber production areas; of this amount, 31,000 acres are hardwood or other suitable wildlife habitat that provides prime hunting areas. Pasture and croplands to be committed to project use total about 13,000 acres. Not all of the lands which become part of the

project will be altered from their present state; portions will even be protected. Implementation of the project will result in the loss of about 190 miles of free-flowing tributary streams which provide habitat for several species of small fish. This loss will be mitigated by the establishment of 40,000 acres of lake fishing area.

The raising of normal water surface elevations will initially cause an increase in recharge rates of ground water aquifers which may create waterlogging on a localized basis but this should be of no major consequence. Possible adverse effects upon ground water resources in areas adjacent to the divide cut include a lowering of the water table, with the most pronounced effects in the vicinity of the divide. As a result a few shallow domestic wells in the area may become unproductive. These wells, however, can be drilled deeper into the lowered water table. Additionally, some low, swampy areas may become drier within the vicinity but this is not expected to be detrimental. Studies underway will more accurately define the effects of the cut and will determine possible remedial actions.

It is estimated that the transfer of water from the Tennessee to the Tombigbee Rivers will average 1,246 cfs per day with maximum use of the Waterway. This amount of water, representing less than 2.5 percent of average flow of the Tennessee River, will no longer be available for generation of electric power or other uses in the Tennessee River Basin, but this quantity will permit year-round navigation and increase the waste assimilative capacity of the Tombigbee River.

Construction of the project will result in the total or partial inundation of several significant paleontological, archeological and historical sites. Archeological investigations and salvage activities of endangered sites will be conducted prior to this submergence. Locations, documentation and preservation of historical antiquities and artifacts will be initiated concurrently with implementation of the project.

Adverse impacts upon fisheries and wildlife will be mitigated by the establishment of lake fisheries and wildlife management areas. However, the people who prefer stream fishing to lake fishing will be adversely affected by implementation of the project. Several universities in both Mississippi and Alabama utilize various portions of the bottomland forest and river for study areas and some opportunities for study of relatively unaltered areas will be forfeited.

Noise levels along the proposed route will be increased beginning with the construction phase; after completion of the project, intermittent noises will be associated with its operation. The more significant increases in noise levels will result from the commercial and industrial activity generated along the Waterway.

A major adverse impact of the project will be upon the people who must relocate. Mitigation of this consequence has been discussed in the "impact section."

6. *Alternatives To The Proposed Action.* Several alternatives to the proposed route have been studied. Generally they can be divided into two categories, Black Warrior route and Upper Tombigbee route. The Black Warrior route follows the existing Black Warrior Waterway into Bankhead Lake which has a water surface elevation of 255 feet m.s.l. Three separate alignments from this point were considered during preliminary planning: (1) Valley Creek, through the City of Birmingham, (2) Locust Fork, and (3) Mulberry Fork. These alignments then enter the Cumberland Plateau and pass through the divide into the Tennessee Valley at Guntersville Lake, elevation 594 feet m.s.l. Total lift for each of these alternative routes is 339 feet, nearly the same as that of the Tombigbee route.

The Upper Tombigbee alternative differs from the authorized route only in channel alignment in the upper portion of the Waterway. Upon exit from Bay Springs Lake, this route turns north-

eastward at the Town of Tishomingo then goes through the divide and enters Pickwick Lake on the Tennessee River at Bear Creek.

Both the Valley Creek and Locust Fork routes require longer canals than does the authorized route and the terrain through which they pass is more rugged. Excavation of limestone and shale composing the Cumberland formations would also be very expensive. While the Mulberry Fork alternative requires a shorter canal, a more extensive divide cut, largely through limestone and shale, would be required and the estimated cost is approximately twice the authorized plan of improvement. Additionally these three routes have less potential for use by commerce from the Mississippi and Ohio Rivers because two additional days of travel time on the Tennessee would be required. This decreases projected navigation benefits without concomitant environmental benefits.

The Cumberland Plateau is one of the most scenic areas in Alabama and is characterized by deep gorges between steep hills. Much of the flora and fauna present is unique in Alabama, being more typical of the Blue Ridge. Consequently adverse impacts of any of these three alignments would probably be more severe than in the authorized plan through Mississippi.

The route considered via Bear Creek from Bay Springs Lake would likewise be difficult to construct. Limestone present along this alignment cannot be excavated economically by conventional methods, and nuclear excavation was considered as an alternate method by which the waterway connection could be provided. Such construction, however, would be complicated by possible increases in background radiation levels and atmospheric contamination along with associated environmental problems.

The primary purpose of the Tennessee-Tombigbee Waterway is to provide an alternative method of transportation for traffic originating or terminating in areas which are not in the immediate vicinity of the Waterway itself. During project economic studies for the Waterway, alternative modes of transportation such as rail, pipeline or truck, and various combinations thereof, were analyzed in determining the prospective commerce and in evaluating the savings in transportation costs to shippers. The cost of transporting the accepted, barge adaptable traffic on a movement-by-movement basis, was determined to be higher via all the practicable alternatives than via the Waterway. In addition, the alternative modes of transportation could not provide the beneficial environmental effects, such as recreation, which would be afforded by the Waterway. Although the rail and highway systems in the area have served the existing industry in the past, industrial development has lagged and underemployment has persisted throughout the area. It is pointed out in the report "An Evaluation of the Water-Related Economic Resource Development of Appalachia in Mississippi," prepared by the Mississippi Research and Development Center, that for the Appalachian area along the Tennessee-Tombigbee Waterway in Mississippi to fully realize the potential growth in economic development, transportation facilities would have to be expanded with particular emphasis being placed on improvement of highway networks in the area. The future expected growth of the demand for transportation would tax the already congested highway system and much of the burden of furnishing transportation would be borne by the railroad under conditions of diminishing competition. A detailed evaluation of the extent and environmental effects of such conditions is not warranted due to the absence of unavoidable adverse environmental effects which would preclude construction of the Waterway and the inability of the alternative modes of transportation to provide the beneficial environmental aspects credited to the Waterway.

The remaining alternative to the proposed action is "no action", a course of action which would deprive this region of the country of a new competitive trade route between the Gulf Coast and the mid-continent of the United States. Cheaper transportation charges which would lower production and marketing costs over a major segment of the United States would be foregone. An estimated $34 million in tangible savings of which about $28 million are savings in transportation costs to shippers on commerce which could move on the waterway would be lost. Other benefits which would not accrue without the project include increased recreational opportunities afforded by the lakes formed, increased fish and wildlife resources, and area redevelopment benefits resulting from employment advantages that the construction, operation and maintenance of the project would provide. In addition, those benefits of a secondary or economic impact nature and those attributable to national defense would be foregone. Commercially navigable waterways stimulate economic growth since certain industries are attracted to waterways to take advantage of low cost transportation. This creates jobs not just related to the industrial establishment alone but to other firms in the trade area, such as suppliers, processors of semi-finished products, and trade or service firms. In the region served by the Tennessee-Tombigbee Waterway, unemployment and low income problems will be alleviated.

National defense benefits for the Waterway have not been estimated in monetary terms. However, the value of inland waterways during World War II is apparent. No prediction could be made as to where additional transportation facilities would be needed most urgently during a war, but after a war emergency arises, the important fact is that it is too late to start construction of the additional facilities. The Tennessee-Tombigbee route directly connects the heavy industrialized Tennessee Valley with the canalized Black Warrior-Tombigbee Waterway and the port of Mobile and adjacent harbors. Industries in these areas contributed heavily to the war effort and undoubtedly this would again be the case if another major emergency arose. The additional transportation capacity which would be provided by the project would help relieve other forms of transportation needed for quick movement of troops and essential military supplies.

7. *The Relationship Between Local Short-term Uses of Man's Environment and the Maintenance and Enhancement of Long-term Productivity.* Implementation of the project will result in establishment of a long-lasting navigable waterway which will provide services for both contiguous and regional areas thereby giving impetus to increased growth of industry and commerce. Social and economic gains resultant from the project will have a regional and national impact as well as a local impact not only initially but for generations in the future. The short-term use will be less pronounced for the local area than for the large regional area where loading and unloading facilities already exist and can take immediate advantage of the new channel. Except in one instance, the population densities of the counties immediately adjacent to the Waterway are less than the national average and half of the counties have a density less than 50 percent of the national average. A rise in the rate of emigration from the project area began during the 1940's and has continued at a high rate. It was seen through analysis of the 1970 census that this trend continues for all counties adjacent to the Waterway except for four in northeastern Mississippi which experienced small net population gains during the past decade. With the establishment of local industrial and commercial facilities and the opportunities for social and economic redistribution into the area, there will be a pronounced intensification of long-term productivity. Lands committed to the Waterway have a significant long-term productivity value without the project; however, benefits

with the project outweigh this value. Additional benefits such as more recreational opportunities and an upgrading of the standard of living of a wide segment of people within the southeastern United States will occur with the project. These benefits will be passed on to future generations in the form of better job and educational opportunities.

Judicious planning in disposal of excess excavated materials will afford opportunities for environmental rehabilitation of blighted areas, such as abandoned gravel pits and eroded gullies, filling and site preparation of industrial and commercial sites, and for other varied uses. The establishment of lakes and deep-water streams will provide the sites for needed recreational facilities. Through these processes the maintenance and enhancement of the productivity of the area become much easier, not only for the present but also in the future.

8. *Any Irreversible and Irretrievable Commitment of Resources Which Would Be Involved in the Proposed Action.* Commitment of the 70,000 acres of land required for construction and operation of the project which otherwise can be utilized for timber production, agriculture, human habitation, and wildlife habitat will be the major irreversible and irretrievable involvements. Other irretrievable commitments will include the diversion of water flows up to 1,246 cfs from the Tennessee River into the Tombigbee Basin which could otherwise be utilized for power generation, the archeological and historical sites directly affected by the implementation of the project, the lowering of ground water levels and artesian aquifer pressure adjacent to or in the vicinity of the divide cut, inundation of existing gravel and other mineral deposits, and the loss of tributary fish habitat. Indirectly, the anticipated economic growth induced by the project may further commit other resources which may now or in the future become irreversible and irretrievable. The labor and materials required for the construction and operation of the project will also be irretrievable.